**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BONNIE McNEIL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-07-3664 |
| | § | |
| MICHAEL ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Bonnie McNeil ("Plaintiff," "McNeil") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Cross-Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #12; Defendant's Cross-Motion for Summary Judgment and Memorandum in Support ["Defendant's Motion"], Docket Entries #8, #9). Each party has also filed a response to the competing motions. (Plaintiff's Response, Docket Entry #14; Defendant's Response, Docket Entry #13). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be GRANTED, that Defendant's motion be DENIED, and that this case be REMANDED with instructions to the administrative law judge ("ALJ") to develop the record further as set out in this opinion.

**Background**

In June, 2004, Plaintiff Bonnie McNeil filed applications for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and Supplemental Security Insurance ("SSI") benefits, under Title XVI of the Act.  (Transcript ["Tr."] at 14, 81-84, 96-112, 311-14).  In those applications, McNeil claimed that she had been unable to work since May 28, 2000, as a result of severe lower back pain that radiates to her legs.  (Tr. at 81, 106, 311).  In other filings during the early part of her application process, McNeil also claimed to be limited by a thyroid disorder, restless leg syndrome, numbness in her legs, and depression.  (Tr. at 18, 56).  In September, 2004, the SSA denied McNeil's applications after finding that she was not disabled for purposes of the Act.  (Tr. at 52-56, 316-22).  McNeil requested reconsideration of those decisions, but the SSA affirmed.  (Tr. at 57, 59-62, 323-26).  On December 30, 2004, Plaintiff requested a hearing before an administrative law judge.  (Tr. at 63).  That hearing, before ALJ Walter Orr, took place on January 23, 2007.  (Tr. at 14-35).  Plaintiff appeared with William Tenery, her non-attorney representative, and she testified in her own behalf.  (Tr. at 14).  The ALJ also heard testimony from Russell Bowden ("Mr. Bowden"), a vocational expert witness.  (*Id.*).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether McNeil was capable of performing substantial gainful activity or was, in fact, disabled:

1.    An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, McNeil has the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

3

be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).   Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.   A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as on his review of the evidence, the ALJ determined that McNeil suffers from severe "degenerative disc disease of the cervical and lumbar spine with residuals post lumbar fusion surgery in May, 2004." (Tr. at 18, 27).   He also found that she suffers from "hypothyroidism, hypertension, amenorrhea with uterine fibroids and ovarian cysts with subsequent total abdominal hysterectomy and bilateral salpino-oophorectomy, migraine headaches, peripheral neuropathy, depressive disorder, and generalized anxiety disorder," but that these conditions are not severe. (Tr. at 27).   He concluded that her degenerative disc disease, either alone or in combination with her other impairments, does not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (*Id*.).   The ALJ also determined that McNeil was able to perform her past relevant work as a bookkeeper and a telephone salesperson. (Tr. at 33).   For these reasons, he concluded that McNeil "has not been under a

4

disability, as defined in the Social Security Act, from May 28, 2000 through the date of this decision."[1] (Tr. at 35). With that, he denied McNeil's application for disability benefits. (*Id.*).

In July, 2007, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 9). As part of her appeal, she submitted additional evidence in the form of medical reports from May and June, 2007, which suggest that she is disabled and unable to work. (Tr. at 8, 9). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On August 15, 2007, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed. (Tr. at 5). With that ruling, the ALJ's findings became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On October 29, 2007, McNeil filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Complaint ["Complaint"], Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Plaintiff's motion for summary judgment be granted, and that Defendant's motion be denied. It is further recommended that the McNeil's application should be remanded, with instructions to the ALJ to develop the record further with regard to her physical and mental condition.

---

[1] McNeil would only have been eligible for disability insurance benefits through March 31, 2003, which is the last date she met the insured status requirements of the SSA. (Tr. at 17, 35). *See* 20 C.F.R. §§ 404.315(a), 404.320(a). She became eligible for supplemental security insurance benefits in July , 2004, which is one month after she applied for those benefits, and remained eligible through the date of the ALJ's decision. (Tr. at 17, 35). *See* 20 C.F.R. §§ 416.335, 416.501.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id*. (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but ... only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the SSA's decision on a number of grounds.  She first argues that the ALJ erred because he did not seriously consider the side-effects of her medications when he determined her residual functional capacity.  (Plaintiff's Motion at 3, 4).  Next, Plaintiff complains that the ALJ erred because he found that she "does not suffer <u>any</u> non-exertional limitations related to her psychiatric impairments." (*Id*. at 5 [emphasis in original]).  She also claims that the ALJ failed to properly develop the record with regard to her mental impairments.  (*Id*. at 6). Finally, McNeil claims that the Appeals Council erred because it did not "properly consider" the additional evidence that she submitted with her appeal.  (*Id*. at 12).  Defendant insists, however, that the ALJ and the Appeals Council properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Response at 11-13).

### *Medical Facts, Opinions, and Diagnoses*

Medical records are available from as early as May 28, 2000, when McNeil underwent a series of cervical spine x-rays at Tomball Regional Hospital, following an automobile accident.  (Tr. at 151).  In his report, Dr. Sumant Patel ("Dr. Patel"), a radiologist, set out his findings, as follows:

> The vertebral bodies are well aligned.  The height of the vertebral bodies appear[s] normal.  There is disk space narrowing at C5/C6 and C6/C7 with anterior and posterior osteophytes.[2]  Neuroforaminal[3] narrowing is noted at C6/C7, more severe on the left.

(*Id*.).  He concluded that McNeil suffers from "[d]egenerative changes of the cervical spine." (*Id*.).

---

[2] An "osteophyte" is "a bony outgrowth, usually found around the joint area."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1169 (5th ed. 1998).

[3] A "foramen" is "an opening in a membranous structure or bone."  *Id.* at 652.

The next records document McNeil's treatment at the Spine and Rehabilitation Center.  (Tr. at 163-75).  These records show that she was first seen at the center on June 12, 2000, because of the injuries she received in the automobile accident.  (Tr. at 171).  At that visit, McNeil complained of right hip pain, headaches, neck pain, and lower back pain.  (*Id.*).  In his report, Dr. Mark Yezak ("Dr. Yezak"), a chiropractor, stated that he found "acute bilateral tenderness" and muscular pain in some areas of the cervical spine, diminished range of motion in the lumbar spine, and lower back pain with the raising of her right leg.  (Tr. at 171-72).  Dr. Yezak diagnosed McNeil as suffering from "[c]ervical spine sprain/strain," "[l]umbar spine sprain/strain," and "[p]ossible lumbar radiculopathy."[4]  (Tr. at 172).  Dr. Yezak prescribed physical therapy for four weeks, and noted, "The patient is currently disabled and should remain off work until further progress has been achieved."  (*Id.*).  Under Dr. Yezak's directive, McNeil first met with Joseph DaJose ("Mr. DaJose"), a physical therapist, on June 16, 2000.  (Tr. at 173-75).  In his report, Mr. DaJose stated that McNeil suffered from increased pain in her neck and back; nocturnal radiculopathy in her right leg; headaches; and dizziness.  (Tr. at 173).  The records show that McNeil began a physical therapy regimen of exercises approximately two to three times a week, and that she generally had a "fair" response to that therapy.  (Tr. at 166, 168-70).  It is unclear when she stopped physical therapy.  On July 14, 2000, on the order of Dr. Yezak, McNeil had an MRI of the lumbar spine, which revealed "[l]ocalized spinal stenosis[5] at L4-5 and mild stenosis at L5-S1 as a result of a combination of facet

---

[4] "Radiculopathy" is "a disease involving a spinal nerve root."  *Id.* at 1377.

[5] The word "stenosis" refers to "an abnormal condition characterized by the constriction or narrowing of an opening or passageway."  *Id.* at 1539.

8

hypertrophy and ligamentum flavum hypertrophy[6] and disc herniations at both levels." (Tr. at 162).

On August 19, 2000, McNeil underwent an MRI of the cervical spine, which revealed the following:

1.  Stenosis of the canal at C6-7 with diffuse disc herniation encroaching upon both neuroforamina especially that on the right.

2.  There is mainly left sided diffuse herniation at C5-6 with foraminal encroachment.  Marked cervical curvature noted.

(Tr. at 158).  She was not injected with the contrast medium for that MRI, but was injected with it before a second MRI, which took place on August 24, 2000.  (Tr. at 157).  After comparing the results of each, the radiologist stated that the "post contrast MRI" did not reveal any additional problems.  (Tr. at 157).  In August and October, 2000, McNeil was seen by Dr. Yezak for follow-up consulations.  (Tr. at 164-65).  After each, Dr. Yezak reported that McNeil continued to suffer from neck and back pain, as well as from pain in her arm.  (*Id*.).  On August 17, 2000, Dr. Yezak sent McNeil to Dr. Kenneth Berliner ("Dr. Berliner"), an orthopedic surgeon, for consultation.  (Tr. at 153-56).  Dr. Berliner met with her twice, and then wrote a report in which he assembled his findings.  (*Id*.).  Dr. Berliner found that McNeil had tenderness in the posterior cervical region and a "markedly diminished cervical range of motion"; tenderness in the lumbar spine; a positive straight leg raise in the right leg; and "diminished sensation in the right hand in the index and middle finger." (Tr. at 154).  He also took note of the MRI results.  (*Id*.).  Dr. Berliner recommended that McNeil undergo surgery on her cervical spine, and receive steroid injections to relieve pain in her lumbar spine.  (Tr. at 155-56).  However, he noted that, ultimately, McNeil would probably need to have surgery on her lumbar spine.  (Tr. at 156).

---

[6] "Hypertrophy" is "an increase in the size of an organ caused by an increase in the size of the cells rather than the number of cells."  *Id*. at 796.

The next records show that, from August 1, 2000, through March 23, 2001, McNeil was treated at the Maternal and Family Clinic, primarily by Dr. Harlan Borcherding ("Dr. Borcherding"), a family practitioner.  (Tr. at 177-93).  As part of the treatment, Dr. Borcherding ordered lab work and steroid injections.  (Tr. at 178, 187, 191-93).  In a report dated August 23, 2000, Dr. Borcherding reported that McNeil was taking Vicodin, Celebrex, and Soma for pain, and had been taken off of another (illegible) medication due to an allergic reaction. (Tr. at 190).  During follow-up examinations in September, 2000, Dr. Borcherding noted that he had also prescribed the antidepressant Elavil.  (Tr. at 188-89).  On October 19, 2000, it was noted that Dr. Borcherding wanted to put her on the pain medication Ultram, but the pharmacy would not fill the prescription unless she was first taken off of Vicodin.  (Tr. at 177).  McNeil had additional follow-up examinations through the following year, which show that she continued to suffer from pain and from depression or anxiety.  (Tr. at 180-83, 186).

The next records, dated from September 5, 2001, through October 21, 2004, document McNeil's treatment by Dr. Gary Randall ("Dr. Randall"), an orthopedic specialist, and Shane Howatt ("Mr. Howatt"), a physician's assistant.  (Tr. at 229-85).  The first record shows that McNeil saw Mr. Howatt on September 5, 2001, complaining of chronic pain in her left side with radiation down her left leg.  (Tr. at 252).  Mr. Howatt diagnosed McNeil as suffering from chronic left side pain and hypertension.  (*Id*.).  He also diagnosed her as suffering from a generalized anxiety disorder.  (*Id*.). McNeil saw Mr. Howatt again on October 19, 2001, and December 6, 2001, and similar notations were made, except that at the last appointment, he changed the mental health diagnosis to "depression."  (*Id*.).  The records show that McNeil saw Mr. Howatt on a regular basis through 2004, and that, during this period, she was additionally diagnosed as suffering from such conditions as

chronic cervical pain, chronic thoracic pain, hematuria,[7] amenorrhea,[8] migraine headaches, hypothyroidism, gastroenteritis, cervic pain, and lumbago.[9]  (Tr. at 249-51).  On August 26, 2003, McNeil underwent an MRI of the cervical spine, which revealed the following:

> There is a prominent degenerative change in the cervical spine with mild reversal of normal cervical lordosis[10] at C4-5 and posterior disc/ridge complexes, which create variable degrees of canal and neural foraminal narrowing.  Canal narrowing is most prominent at C6-7, where there is at least borderline cord impingement and significant bilateral neural foraminal stenosis as well.  Leftward neural foraminal stenosis and mass effect in the left lateral recess at C3-4.  At C5-6, there is fairly borderline canal stenosis but this does extend behind the C6 vertebral body as well.

(Tr. at 280, 282).  On the same date, she had an MRI of the lumbar spine, which revealed the following:

> Evidence of degenerative disc disease in the lower lumbar spine with prominent reactive marrow changes at L4 and L5 and mild to moderate at L4-5.

(Tr. at 281).  On September 26, 2003, Dr. Randall ordered a pelvic ultrasound, which revealed that McNeil had at least one fibroid and two ovarian cysts.  (Tr. at 284). From October 24, 2003, through April 15, 2004, McNeil was treated by Dr. Verner Nellsch ("Dr. Nellsch"), a gynecologist.  (Tr. at 207-09).  Dr. Nellsch confirmed that she had a uterine fibroid tumor and a cyst on her left ovary.

---

[7] "Hematuria" is the "abnormal presence of blood in the urine."  *Id*. at 742.

[8] "Amenorrhea" is "the absence of menstruation."  *Id*. at 72.

[9] "Lumbago" is "pain in the lumbar region caused by a muscle strain, rheumatoid arthritis, osteoarthritis, or a herniated intravertebral disk."  *Id*. at 960.

[10] "Lordosis" is "an abnormal anterior concavity of the lumbar part of the back."  *Id*. at 956.

(Tr. at 209). On January 27, 2004, McNeil underwent a total abdominal hysterectomy[11] and a bilateral salpingo-oophorectomy[12] to remove them.  (Tr. at 21, 199-205).

On December 22, 2003, on Mr. Howatt's referral, McNeil was seen by Dr. Stig Peitersen ("Dr. Peitersen"), a neurosurgeon, for a consultation regarding her physical condition.  (Tr. at 194-97).  At that visit, McNeil complained of pain in her lower back, right arm, right buttocks, right shoulder and biceps.  (Tr. at 195).  She also reported that she falls intermittently because her hip "giv[es] out."  (*Id.*).  Dr. Peitersen diagnosed McNeil as suffering from "[r]ight upper extremity pain," cervical spondylosis,[13] and "[c]hronic low back pain likely related to her lumbar spondylosis at L4-5 and L5-S1."  (Tr. at 197).  Dr. Peitersen concluded that there was "[n]o need for any cervical or lumbar spine surgery at this point," but stated that if McNeil ever has lumbar surgery, it should include a lumbar fusion.  (*Id.*).  He also stated that "[f]urther evaluation of her right shoulder may be indicated."  (*Id.*).

On February 16, 2004, McNeil saw Dr. Randall for medication refills, and complained of neck stiffness, soreness, and pain; chronic back pain; and amenohhrea.  (Tr. at 241-43).  Dr. Randall prescribed Soma for her muscle spasms, and Ultracet for pain.  (Tr. at 243).  McNeil followed up with Dr. Randall on March 18, 2004, and he noted that she had been scheduled to have back surgery, specifically, a "360-degree polar fusion with pedicle screw fixation bilaterally at L4-5 and L5-S1." (Tr. at 238-40).  The surgery took place on May 10, 2004, at the Nacogdoches Medical Center.  (Tr. at 211-25, 234).  The post-operative diagnosis was "[s]evere lumbar spondylosis with degenerative

---

[11]A "hysterectomy" is the "surgical removal of the uterus."  *Id.* at 804.

[12] A "salpingo-oophorectomy" is "the surgical removal of a fallopian tube and an ovary."  *Id.* at 1447.

[13] "Spondylosis" is "a condition of the spine characterized by fixation or stiffness of a vertebral joint."  *Id.* at 1528.

disc disease and stenosis at L4-5 and L5-S1 bilaterally." (Tr. at 216). McNeil was seen by Dr. J. Michael Randle ("Dr. Randle"), a neurosurgeon, on July 8, 2004, for a post-operative consult. (Tr. at 234). At that visit, McNeil complained of numbness in her toes, and of severe muscle spasms in her legs at night. (*Id.*). She also told Dr. Randle that "when she lays down her legs move on their own." (*Id.*). Dr. Randle examined her, and found that the surgical wound was healing well. (*Id.*). However, he also found that there was "some decreased range of motion in every direction," and that she experienced back and leg pain when her legs were raised 30 degrees. (*Id.*).

On July 13, 2004, Dr. Gary Randall listed the medications that McNeil was then taking, which included Levoxyl and Norco for pain; Soma for muscle spasms; Acyclovir for a viral rash; Premarin for menstrual problems; and Lexapro and Xanax for depression and anxiety, respectively. (Tr. at 254). On August 12, 2004, and October 21, 2004, Mr. Howatt filled out one-page forms, titled "Treating Physician Mental Function Assessment Questionnaire," for the state. (Tr. at 229, 230). On these forms, he checked boxes to indicate that McNeil was being treated for a "mental condition," and that this condition imposed few limitations. (*Id.*). He reported her diagnosis as generalized anxiety disorder. (*Id.*).

On October 29, 2004, Dr. Eun Kwun ("Dr. Kwun"), a family practitioner, completed an assessment of McNeil's physical residual functional capacity, on behalf of the state. (Tr. at 287-94). Dr. Kwun's findings were affirmed by Dr. Bob Dodd ("Dr. Dodd"), an internist. (Tr. at 287). On the form, Dr. Kwun diagnosed Plaintiff as suffering from hypothyroidism, in addition to back pain. (*Id.*). Dr. Kwun found that McNeil could occasionally lift or carry objects weighing twenty pounds and frequently lift or carry objects weighing ten pounds; she could sit or stand for six hours in an eight-hour workday; and was not limited in her ability to push or pull, other than the limitations on

13

the weight that she can lift.  (Tr. at 288).  He also found that McNeil could frequently climb ramps and stairs and could balance; she could occasionally stoop, kneel, crouch, or crawl; and she could never climb ladders, ropes, or scaffolds.  (Tr. at 289).  Further, Dr. Kwun determined that McNeil had no manipulative, visual, communicative, or environmental limitations.  (Tr. at 290-91).  Dr. Kwun concluded that McNeil's "alleged limitations are not fully supported by the objective medical evidence of record."  (Tr. at 292).  In his assessment, Dr. Kwun stated that there were no treating or examining source statements regarding McNeil's physical capabilities in the file.  (Tr. at 293).

Also on October 29, 2004, Dr. Leela Reddy ("Dr. Reddy"), a psychiatrist, completed a Psychiatric Review Technique form ("PRTF"), on behalf of the state.  (Tr. at 295-308).  In that form, Dr. Reddy reported that McNeil suffered from a depressive disorder and from anxiety, but that they were not severe.  (Tr. at 295, 298, 300).  In addition, Dr. Reddy determined that McNeil was only mildly limited in her ability to participate in activities of daily living, but that she had difficulty in "maintaining social functioning" and in "maintaining concentration, persistence, or pace."  (Tr. at 305).  Finally, she reported that McNeil's "[a]lleged limitations [were] not fully supported by" the evidence.  (Tr. at 307).

There are two "medical release" forms of record that were completed by Dr. Aditya Gupta ("Dr. Gupta"), an internist.  (Tr. at 309-10).  One is dated June 6, 2005, and the other is not dated.  On both of these forms, Dr. Gupta lists "migraine headaches" as the "primary disabling diagnosis," and peripheral neuropathy[14] as the "secondary disabling diagnosis."  (*Id*.).  On both forms, he states that McNeil cannot stand, walk, climb, kneel, bend, push, use a keyboard, lift, or carry for any period of time during a typical workday.  (*Id*.).  On one form, he states that McNeil can sit for one

---

[14] The word "neuropathy" refers to the "inflammation or degeneration of the peripheral nerves."  *Id*. at 1104.

hour in an average workday, and on the other form he reports that she can sit for two hours.  (*Id*.).  On both forms, Dr. Gupta also indicated that McNeil's conditions are not "permanently" disabling, but that they are "expected to last more than 6 months."  (*Id*.).

The next medical record is dated May 3, 2007, and it documents McNeil's examination by Dr. Jerry Wood ("Dr. Wood"), a family practitioner, at Memorial Medical Center.  (Tr. at 329-30).  The record shows that McNeil was admitted to the center with a diagnosis of "[a]cute bronchitis, possible pneumonia and medication overdose."  (Tr. at 329).  Dr. Wood reported that McNeil was under the following prescription medicine regimen:  Klonopin twice a day; aspirin once a day; Levoxyl once a day; Ultram three times a day; Soma four times a day; Neurontin three times a day; hydrochlorothiazide once a day; Mobic twice a day; the Lortab four times a day; Lunesta at bedtime; and Lisinopril once a day.  (*Id*.).  He found that McNeil had taken too much of her prescribed sedative, and that, as a result, she appeared sluggish and was difficult to assess.  (Tr. at 329-30).  Dr. Wood had her admitted overnight to receive IV antibiotics and respiratory help, and noted that he would "hold her medications and make her more alert" so that he could better assess her condition.  (Tr. at 330).  There is no record of the reassessment.

The last medical record, dated June 15, 2007, is a "medical release" form that was completed by Dr. Borcherding.[15]  (Tr. at 327).  On that form, Dr. Borcherding reports that McNeil is unable "to work, or participate in activities to prepare for work, at all" due to a permanent disability.  (*Id*.).  It is difficult to decipher the diagnoses that he based his opinion on, but they each appear to contain the word "lumbar," so it follows that the disabling condition was related to her back problems.  (*See id*.).

---

[15] The Appeals Council stated that the physician's signature on this form is illegible.  (Tr. at 8).  However, the address matches that of one of Dr. Borcherding's offices, and the signature appears to read "H. Borcherding."  (Tr. at 327).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, McNeil was 51 years old.  (Tr. at 14; Plaintiff's Motion at 1).  She had completed her GED, and had taken classes in bookkeeping.  (Tr. at 14, 103; Plaintiff's Motion at 1).  McNeil's work history includes jobs as a telephone sales person, an office manager, and a bookkeeper.  (Tr. at 33, 357).

### *Subjective Complaints*

In her applications for DIB and SSI benefits, McNeil claimed that she suffers from "severe back pain" which resulted from an automobile accident and the consequent surgery on her back.  (Tr. at 81, 311).  She explained, as well, that "[t]he pain before and since recent surgery has kept [her] from being able to function."  (Tr. at 97).  McNeil also completed a pain report, in which she described her pain as occurring "continuously" and on a daily basis.  She reported this pain to be primarily in her lower back and down her leg.  She characterized it as aching, burning, cramping, crushing, stabbing, stinging, and throbbing.  (Tr. at 107).  She stated that any movement, including walking or sitting, exacerbates the pain.  (*Id*.).  She also stated that the pain will not stop unless she is "totally knocked out with too much med[icine]."  (*Id*.).  She claimed that she spends most of her days lying down.  (Tr. at 147).  On October 12, 2004, McNeil completed a daily activity questionnaire, in which she stated that she was also limited by depression.  (Tr. at 139).  She reported that she was being treated for depression and anxiety with Zoloft and Xanax.  (Tr. at 139, 142).  In that questionnaire, McNeil claimed that her depression and anxiety cause her to retreat, to "holler at people", and to cry a lot.  (Tr. at 141-42).  In another part of her application, she described herself as "on edge a lot" and prone to losing her temper.  (Tr. at 145).  She also stated that she could not afford to see a psychiatrist.  (Tr. at 143).  As part of the application process, McNeil wrote down her daily medication schedule.  It included eight medications in the morning, six in the middle of the day, and seven at night, as well as the use of an inhaler every six hours.  (Tr. at 149).  When McNeil appealed the SSA's decision to deny her benefits, she informed them that she had been

16

diagnosed with restless leg syndrome, and that she was suffering from severe "mood swings." (Tr. at 130, 135).

At the hearing, McNeil explained that her disability began in May, 2000, when she was involved in a car accident that caused two herniated discs. (Tr. at 335). She testified that, four years later, her condition had progressed so that she underwent surgery for a spinal fusion, which included the placement of a pin and titanium screws in her lower back.[16] (Tr. at 335-36). She then testified that, not only did she not experience relief from the surgery, but that, in fact, she is worse because "it gave [her] the restless leg syndrome." (Tr. at 336). She explained that the restless leg syndrome is a chronic condition that she "will have for the rest of [her] life." (Tr. at 342). She testified further that her back pain radiates down her legs, apparently to the point that she sometimes cannot move at all. (Tr. at 339). McNeil also testified that her cervical spine problems make it difficult for her to use her hands and arms. (Tr. at 340). McNeil testified that she also suffers from incontinence, which occurs two to three times a week, and migraine headaches once a month that last for two to three days. (Tr. at 340-42).

McNeil testified that she cannot work, in part, for the following reasons:

I can't sit for a long period of time, I cannot drive at all because I have the restless leg syndrome, and if I go to put my foot on the brake or on the gas pedal, there's no telling which one it's going to hit or if I'm going to stop correctly.

\* \* \*

I can't sleep, I can't walk without my cane. Usually if I'm in the house, I'll use my wheelchair. I can't bend down at all or pick something up because I can't get up.

(Tr. at 334-36). Further, she testified that she cannot walk for long periods of time, and cannot regularly stand, bend, lift, stoop, grasp, or work with her arms extended. (Tr. at 337-38, 340-41). McNeil also testified that, because she has limited use of her upper extremities, she cannot garden,

---

[16] Later, she attributed the delay between her injury and her surgery to her lack of funds to pay for the procedure. (Tr. at 352).

sweep, or vacuum.  (Tr. at 340).  McNeil rated her back pain as between seven  and one half and

nine on a scale of ten.  (Tr. at 338).

McNeil also testified regarding the multiple medications she takes.  (Tr. at 336-38).  She

stated that she takes Morphine and Lorcet for pain on a rotating basis throughout each day.  (Tr. at

336).  She also stated that she takes Soma for muscle spasms, and Lasix to help relieve wheezing

and coughing spells.  (Tr. at 336-37).  Further, she testified that she was given three steroid

injections in 2000, but that they did not relieve her pain.  (Tr. at 339).  As to the side effects of these

medications, McNeil testified that she experiences drowsiness, to the extent that she sometimes "just

fall[s] asleep in [her] food."  (Tr. at 337).  In addition, she stated that the Morphine clouds her

thinking.  (*Id*.).  As to non-medication pain relief, McNeil testified that she uses an electrical cold

pack, and, on occasion, a heating pad.  (Tr. at 339).  She also stated that she often uses a cane to

walk, and that she wears a back brace to help relieve pain and muscle spasms.  (*Id*.).

Next, McNeil testified that she suffers from depression and anxiety.  (Tr. at 343).  She stated

that she takes medication, which helps her, and that some of her depression is caused by the fact that

she cannot just "get up and do what [she] want[s] to do," including activities with her fifteen-year-

old son.  (Tr. at 343-44).  McNeil testified that depression and anxiety limit her on a regular basis,

because,

> . . . they will keep me from doing what I need to do because I don't want to get up,
> I don't want to talk to nobody, . . . I just want to be left alone because . . . when I
> have the anxiety, I kind of lose it and scream at people and that's not a good thing.

(Tr. at 344).  She also testified that these conditions make her sleep poorly, and have resulted in

memory and concentration problems.  (Tr. at 344-45).  In addition, McNeil testified that depression

and anxiety have drastically affected her appetite and her weight, explaining, "Before this started

I was a very small lady, now I'm almost 200 pounds."  (Tr. at 345).

Finally, McNeil testified as to how she spends a typical day:

> I've been trying to get up a[t] 6:00 in the morning and take my medication.  I have
> two groups [of medications].  By the time I end taking and drinking some coffee and
> some water, by the time I end up taking those medications, I'm asleep.  Then in the
> afternoon I have some that I have to take for the pain and nothing for sleeping, just
> the pain and the muscle spasms and I can watch [television].  By the time 5:00 gets
> there, I'm asleep again.

(Tr. at 346).  She testified that she cannot cook, and that friends and family members do the cleaning

and the shopping.  (*Id*.).  She also stated that once every two weeks, she might accompany someone

on a shopping trip, and "ride in one of those little buggies" or use her cane.  (*Id*.).  McNeil testified

that she gets along well enough with people, and that she goes to church once a month.  (Tr. at 347-

48).

### *Expert Testimony*

At the hearing, the ALJ also heard from Russell Bowden, a vocational expert witness.  (Tr.

at 357-61).  Mr. Bowden testified that McNeil's prior job as a telemarketer was semi skilled and

sedentary work; that her job as an office manager was skilled and light work; and that her job as a

bookkeeper was skilled and sedentary.  (Tr. at 357).  He testified that, given the limitations ascribed

to her in the state's RFC assessment, she would still be able to perform any of these jobs.  (Tr. at

358).  The ALJ asked whether she could perform those jobs if she could only engage in sedentary

activity, and Mr. Bowden replied that she would  be precluded only from the position of office

manager.  (*Id*.).

McNeil's representative also took the opportunity to question Mr. Bowden, and the following

exchange occurred:

> Q      If she has the limitations she described in her oral testimony, would she be
> able to perform her past work?
>
> A      Well, I think the main thing vocationally that [I] heard was that she's
> spending a lot of time sleeping or in bed --
>
> Q      Right.
>
> A      In a normal, what would be considered a normal workday, and if we use that
> as an RFC, then that would preclude her past work or any competitive employment,

because you have to have a capacity to sit, stand or walk for eight hours in order to perform competitive employment.

Q       Okay. Now if, did you see the residual functional capacity assessment that her treating physician supplied?

A       No, I was not provided that.

Q       His residual functional capacity assessment says that she can sit for up to an hour, but that all other physical activities are precluded. If this, this being the case, would she have an adverse vocational outlook?

A.      When you say all other are precluded, she can't stand or walk at all under his RFC?

Q       No standing.

A       No standing. If the person only has the capacity to sit for one hour, no standing, the assumption is she'd spend the other seven hours lying down, again, that would preclude competitive employment.

Q       Okay. Given the hypothetical that she can do sedentary work activity, if it is later proven that she, her mental limitations significantly interfere with focus, concentration, attention, persistence and pace, would her vocational outlook be favorable?

A       Well it depends on the severity. Usually when you look at work related activities such as the ones you've described, there'll be a range of limitation, and if a person has marked ability, which by definition means they don't have any useful capacity in that area, if a person is assessed at that degree of limitation, then those impairments of normal work functions could preclude all work.

Q       Okay. And an individual that would miss at least two days of work due to migraine headaches, would that be tolerated in a normal job setting?

A       I think that's borderline. My experience has been that, particularly since her past work has been semiskilled and skilled, that perhaps two days a month might be tolerated with a combination of sick leave, vacation, paid holidays, but if you'd begin to exceed that on a regular basis, it really puts in jeopardy a person's ability to maintain employment.

(Tr. at 359-61). The ALJ did not ask Mr. Bowden any follow-up questions.

***The ALJ's Decision***

20

Following the hearing, the ALJ made written findings on the evidence. From his review of the record, he determined that McNeil suffers from severe "degenerative disc disease of the cervical and lumbar spine with residuals post lumbar fusion surgery in May, 2004." (Tr. at 18, 27). He also found that she suffers from "hypothyroidism, hypertension, amenorrhea with uterine fibroids and ovarian cysts with subsequent total abdominal hysterectomy and bilateral salpino-oophorectomy, migraine headaches, peripheral neuropathy, depressive disorder, and generalized anxiety disorder," but concluded that these conditions are not severe. (Tr. at 27). In addition, the ALJ determined that McNeil was able to perform her past relevant work as a bookkeeper and a telephone salesperson. (Tr. at 33). For these reasons, he concluded that McNeil "has not been under a disability, as defined in the Social Security Act, from May 28, 2000 through the date of this decision."[17] (Tr. at 35). With that, he denied McNeil's applications for disability benefits. (*Id.*).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See Id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

As a preliminary matter, although McNeil is now represented by an attorney, she was assisted by a non-attorney at the administrative hearing and through some of the administrative process, and had no representation at other stages of the administrative process. (Plaintiff's Response at 1). In fact, she had no form of representation at the Appeals Council level, when she

---

[17] McNeil would only have been eligible for disability insurance benefits through March 31, 2003, which is the last date she met the insured status requirements of the SSA. (Tr. at 17, 35). *See* 20 C.F.R. §§ 404.315(a), 404.320(a). She became eligible for supplemental security insurance benefits in July , 2004, which is one month after she applied for those benefits, and remained eligible through the date of the ALJ's decision. (Tr. at 17, 35). *See* 20 C.F.R. §§ 416.335, 416.501.

attempted to submit additional evidence on her own behalf.  (*Id*. at 1-3).  When a Social Security claimant is not represented by counsel, the ALJ "is under a heightened duty to scrupulously and conscientiously explore all relevant facts."  *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Jones v. Barnhart*, 372 F. Supp. 2d 989, 1006 n.4 (S.D. Tex. 2005) (Botley, J.).  This heightened duty exists even when the claimant is represented by a non-attorney representative.  *See id.* (finding that the ALJ had a heightened duty to develop the record when the claimant "was not represented by an attorney during her administrative hearings, but, instead, by a paralegal with Lone Star Legal Aid").  If a claimant is not represented by an attorney, the Fifth Circuit has stated, as follows:

> We will reverse the decision of an ALJ as not supported by substantial evidence if the claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby.

*Brock*, 84 F.3d at 728.

Plaintiff first argues that the ALJ erred because he failed to consider the side-effects of her medications and how they impact her ability to work.  (Plaintiff's Motion at 3-4).  "[I]f an individual's medical treatment [which would include drug therapy] significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity."  *Francois v. Commissioner of Social Sec.*, 158 F. Supp. 2d 748, 770 (E.D. La. 2001) (citing *Newton*, 209 F.3d at 459).  Further, under the regulations, the Commissioner is required to consider the "'type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [her] pain or other symptoms.'"  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (quoting 20 C.F.R. § 404.1529(c)(3)(iv)).  The duty to consider the side effects of medicines has been deemed of particular importance when medications are of a type that affect the brain, such as anti-depressant and anti-anxiety drugs.  *See Loza v. Apfel*, 219 F.3d 378, 381, 394 (5th Cir. 2000).  In this case, the ALJ did not address the medication in detail, and, in fact, found that McNeil did not make many

complaints regarding medication side effects.  (Tr. at 25).  However, this finding ignores  both her testimony and medical record evidence that she takes daily medication which makes her drowsy and affects her thinking.  (Tr. at 107, 149, 329, 336-38).  At the hearing, McNeil testified that the drowsiness she experiences from her medicine sometimes makes her "just fall asleep in [her] food." (Tr. at 337).  When questioned by the ALJ, she also stated that the Morphine clouds her "consciousness".  (*Id.*).  Further, in her application for benefits, she noted that she was sometimes "totally knocked out with too much med[icine]."  (Tr. at 107).  When she was hospitalized by Dr. Wood, she appeared to be overly medicated.  (Tr. at 329).  She claimed that she spends most hours of the day lying down or sleeping.  (Tr. at 147).  The medical records confirm that McNeil has been taking a large combination of prescription medications every day for several years.  (*See* Tr. at 188-90, 246, 254, 329-30).  They also confirm that she has consistently been on a regimen that includes multiple pain medications, anti-depressant or anti-anxiety medications, and blood pressure medications on a daily basis.  (*See id.*).  It appears, then, that it is reasonable to suspect   that Plaintiff suffers from side effects of these medications that interfere with her ability to work.

Unfortunately, the ALJ did not solicit additional evidence or any explanations regarding the possible side effects of these medications.  Considering the quantity prescribed, and the seriousness of the medications, it would have been particularly helpful if the ALJ had obtained the testimony of a medical professional regarding potential side effects when these specific medications are taken together.  The ALJ relied on the fact that McNeil did not make many complaints that were directly aimed at her medications.  (Tr. at 25).  However, the fact remains that, for several years, McNeil has been on a heavy medicine schedule, and has concurrently spent most of her time lying down, sleeping, or feeling anxious or depressed.  Under these circumstances, and given her lack of legal representation, the ALJ breached his duty to develop the record further as to the effect of her medications on her ability to work.  *See Loza*, 219 F.3d at 381; *Crowley*, 197 F.3d at 199 (quoting 20 C.F.R. § 404.1529(c)(3)(iv)); *Francois*, 158 F. Supp. 2d at 770 (citing *Newton*, 209 F.3d at 459).

23

It is true, nevertheless, that Plaintiff's claim cannot succeed unless she shows that she was prejudiced by the ALJ's failure. *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981). It is well settled that, if an agency "violate[s] its rules and prejudice result[s], the proceedings are tainted and any actions resulting from the proceeding cannot stand." *Id.* In a social security benefits case, an individual establishes prejudice by showing that, absent the violation, a different result might have been reached. *See Ripley*, 67 F.3d at 557. Here, there can be no doubt that a different result might have been reached had the ALJ explored further how the side effects of McNeil's medications, alone or in combination with each other and with her impairments, might impede her residual functional capacity. For this reason, she has been prejudiced by the ALJ's error, and remand is warranted. *See Brock*, 84 F.3d at 728; *Ripley*, 67 F.3d at 557.

On remand, the ALJ should also develop the record further with regard to Plaintiff's mental condition at the time of the hearing. In her motion, Plaintiff complains that the ALJ erred when he found that she "does not suffer <u>any</u> non-exertional limitations related to her psychiatric impairments." (Plaintiff's Motion at 5 [emphasis in original]). She also argues that there was sufficient evidence that she suffers from depression to invoke the ALJ's duty to develop the record further as to her mental impairments. (*Id.* at 6). In addressing McNeil's claim that she could not work because of mental limitations, the ALJ accurately noted that what little objective evidence there is of her mental impairments indicates that they were being controlled by medication. (Tr. at 25). He also stated that McNeil claimed that she would not be depressed if she was not in pain, and that she had not sought the treatment of a psychiatrist.[18] (*Id.*). In this case, however, the record is clear that McNeil has sought and received treatment for depression and anxiety on an ongoing basis, from her primary doctors, from as early as September, 2000. (Tr. at 139, 142, 188-89). In her application for benefits, McNeil stated that depression and anxiety cause her to retreat from people

---

[18] In a Daily Activity Questionnaire, McNeil stated that she is being treated for depression by her primary doctor because she "cannot afford a psychiatrist." (Tr. at 143).

or to lose patience with them, and also lead her to cry a lot.  (Tr. at 141-42).  She also described

herself as being "on edge a lot" and as prone to losing her temper.  (Tr. at 145).  At the hearing,

McNeil testified that depression and anxiety limit her activity on a regular basis because they make

her reluctant to  "want to get up" or to talk to people.  (Tr. at 344).  She also testified that when she

gets anxious, she "kind of lose[s] it and scream[s] at people and that's not a good thing."  (*Id*.).  In

addition, McNeil testified that her mental impairments cause her to sleep poorly, have resulted in

significant weight gain, and cause her to have poor memory and concentration.  (Tr. at 344-45).

Further, at the hearing, Plaintiff's representative asked the ALJ for the opportunity to have a

psychiatrist examine her.  (Tr. at 334).   It is likely that McNeil did not get that examination  after

the ALJ made it clear that he would not consider a psychiatrist's report.  This is shown in the

following exchange between Plaintiff's representative and the ALJ:

> REP:  Are you, will you consider psychiatric consultative exams to determine --
>
> ALJ:   No sir.
>
> REP:   Whether the –
>
> ALJ:   No.
>
> REP:   Okay, might I ask why?
>
> ALJ:   Yeah, there's no evidence of a severe psychiatric impairment.
>
> REP:   Well there is --
>
> ALJ:   And her own testimony was that it's non severe. . . .  [H]er physician says she
> doesn't have a severe psychiatric impairment and she, in her testimony today said
> she does not have a severe psychiatric impairment, and I'm going to, that is going to
> be my finding.

(Tr. at 361).  Yet, considering the evidence of the lack of daily activity, McNeil's own testimony

of anti-social behavior, and her history of taking a variety of medications for depression and anxiety,

the findings of an examining psychiatrist would likely have proven helpful.

Further, while it cannot be used as evidence in this case, Plaintiff has attached to her motion a copy of a psychiatric evaluation that she had on November 21, 2007, by Dr. Jaime Ganc ("Dr. Ganc"). (Plaintiff's Response at 7 and Exhibit ["Ex."] B). That evaluation reveals that McNeil suffers from serious mental problems, and it is relevant to her condition in this case because it was made just five months after the date of the ALJ's decision, when McNeil was last eligible for SSI benefits under the pending application. *See* 20 C.F.R. §§ 416.335, 416.501. As part of his evaluation, Dr. Ganc gave McNeil a series of evaluations to determine her mental state. (Plaintiff's Response at Ex. B, 1). Dr. Ganc found that on the Beck Depressive Inventory Scale, McNeil scored "55," which reflects "the severe level of depression." (*Id*. at Ex. B, 4). He found that on the Beck Anxiety Inventory Scale, McNeil scored "60," which also indicates "the severe level of depression." (*Id*.). Dr. Ganc reported that McNeil's results on the Sentence Completion test revealed the following:

> . . . an individual who is depressed, and worried about this. Sense of being mistreated, confused, that her life goes in circles. With a deep sense of helplessness that she needs a lot of external help. Isolation, total failure, and distressed.

(*Id*.). Dr. Ganc rated McNeil's condition on the Diagnostic and Statistical Manual of Mental Disorders, and concluded that she suffers from "major depressive disorder with psychotic features; generalized anxiety disorder; and mild personality disorder. (*Id*. at Ex. B, 5). Dr. Ganc's prognosis for McNeil is telling, not only about her mental state, but also in regard to her ability to assess her physical condition, as well:

> The prognosis in this case is extremely poor. I think that at the present time, Ms. McNeil is psychotic in her conceptualization of her physical condition. Her magnification of her symptoms is perceived as totally real and is extremely handicapping. This magnification has reached a psychotic level of delusional proportions. Her insight is nil. Her response to psychiatric treatment, I think will be very limited.

(*Id.*). This evaluation, of course, is evidence only that McNeil had severe mental limitations at the time of the exam, and does not speak to her mental state at the time relevant to this opinion. However, it does add  credence to Plaintiff's contention that had more evidence been obtained during the administrative process, it might have yielded a different result.  In this case, then, the ALJ should have developed the record further with regard to McNeil's emotioned condition.  She has been prejudiced by the ALJ's failure, and remand is warranted on this ground, as well.  *See Brock*, 84 F.3d at 728; *Ripley*, 67 F.3d at 557.

In sum, the ALJ's decision to deny disability benefits to McNeil was not supported by substantial evidence.  For that reason, the Commissioner's determination that McNeil is not disabled and his consequent denial of SSA benefits should be reversed, and his decision should be remanded for further development of the record as to McNeil's physical and mental impairments.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.

It is further **RECOMMENDED** that the SSA's final decision should be **REMANDED**, with instructions to the ALJ to develop the record further as set out in this memorandum.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the

chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

  **SIGNED** at Houston, Texas, this 16th day of March, 2009.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**